## UNITED STATES DISTRICT COURT
### DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT KREB, an individual, | Case No.: 3:16-cv-00444-REB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| JACKSONS FOOD STORES, INC., a Nevada Corporation, JACKSON JET CENTER, LLC, an Idaho Corporation, and CONYAN AVIATION, INC., d/b/a Jackson Jet Center, an Idaho Corporation | **(Dkt. 126)** |
| Defendants, | |

Pending before the Court is Defendants' Motion for Summary Judgment (Dkt. 126). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. BACKGROUND[1]

In November 2013, Plaintiff Robert Kreb applied to a Life Flight Network, LLC ("LFN") job posting. He was hired the next month – not by LFN, but by Defendants Jacksons Food Stores, Inc., Jackson Jet Center, LLC, and Conyan Aviation, Inc., d/b/a Jackson Jet Center (collectively referred to as "Jacksons" or "Defendants"). *See* Pl.'s First Am. Compl., ¶¶ 6-7, 15-17 (Dkt. 78). This unusual arrangement stemmed from the fact that when Plaintiff was hired, Jacksons held a Federal Aviation Administration ("FAA") Part 135 Certificate, while LFN did not. *See id*. at ¶¶ 9, 18. So, it was Jacksons that actually hired Plaintiff to fly fixed-wing

---

[1] Plaintiff's claims began in Washington state court before being removed to federal court in the Western District of Washington. The federal court in Washington then ordered the case transferred to this Court, while separate administrative claims proceeded before the Department of Labor.

**MEMORANDUM DECISION AND ORDER - 1**

emergency medical response planes for emergency medical transport services provided by LFN, with LFN contracting with Jacksons for Plaintiff's services until LFN secured an FAA Part 135 Certificate and formally (re)hired Plaintiff itself.  *See id*. at ¶¶ 6-7, 10, 18-19.  In short, Jacksons technically employed Plaintiff, but his work followed dispatch directions from LFN employees, he piloted LFN-owned planes, followed LFN handbooks and safety guidelines, reported to LFN supervisors, wore an LFN uniform, and was to follow LFN protocols.  *See id*. at ¶¶ 8, 19.

While employed, Plaintiff raised many complaints with Jacksons and/or LFN about alleged failures to pay him wages and other compensation he says he was promised.  *See generally id*. at ¶¶ 34, 38-57.  Jacksons ultimately fired Plaintiff on July 10, 2014, one day after he raised alleged safety concerns (concerns questioned by Jacksons) about an LFN flight he was scheduled to pilot.  *See id*. at ¶¶ 58-67.  Following his termination, Plaintiff claims that he was "blacklisted" from other pilot jobs, and that although now employed, he moved to New Mexico with his family because he could not obtain employment in the Pacific Northwest.  *See id*. at ¶¶ 70-74.  This action followed.

Originally, Plaintiff alleged that Jacksons and LFN owe him unpaid wages and other compensation (first claim), wrongfully discharged him in violation of public policy (second claim), and breached their employment contract with him (third claim).  *See* Pl.'s Compl., ¶¶ 1.1, 5.1-7.3 (Dkt. 1, Att. 1).  Among other things, Plaintiff sought unpaid wages, lost future wages, punitive damages, exemplary damages, and emotional distress damages.  *See id*. at ¶¶ 8.1-8.11.

Jacksons moved for summary judgment on December 7, 2016.  *See* Jacksons' MSJ (Dkt. 46).[2]  On the same day Plaintiff responded to Jacksons' Motion for Summary Judgment, Plaintiff

---

[2]  On July 25, 2017, the parties stipulated to LFN's dismissal from this action and, on August 1, 2017, the Court entered an Order to that effect.  *See* Stip. (Dkt. 71); 8/1/17 Order (Dkt. 72).  LFN's dismissal had no effect on Plaintiff's claims against Jacksons or, likewise, Jacksons' defenses to Plaintiff's claims against them.  *See id*.

MEMORANDUM DECISION AND ORDER - 2

also moved to amend his Complaint.  *See* Pl.'s Resp. to MSJ (Dkt. 60); Pl.'s Mot. for Leave to Am. Compl. (Dkt. 62).

On March 12, 2018, the Court granted, in part, and denied, in part, Jacksons' Motion for Summary Judgment.  Plaintiff's wage claim (first claim) was dismissed as time-barred (except for insurance benefits-related wage claims); Plaintiff's wrongful discharge claim (second claim) premised upon safety concerns (but not premised upon wage concerns) was dismissed because it was precluded by Plaintiff's then-pending, related administrative action; and Plaintiff's breach of contract claim (third claim) was dismissed as time-barred.  *See* 3/12/18 MDO, pp. 12-20, 22-23 (Dkt. 77).  The Court also granted Plaintiff leave to amend his Complaint to add a Fair Labor Standards Act ("FLSA") claim for retaliation based on Plaintiff's complaints regarding overtime. *See id*. at pp. 20-23.

Consistent with the Court's March 12, 2018 Memorandum Decision and Order, Plaintiff's eventual First Amended Complaint asserts three amended claims against Jacksons: (1) failure to pay insurance-related wages due; (2) wrongful termination in violation of public policy based on wage concerns; and (3) retaliation under the FLSA.  *See* Pls.' First Am. Compl., ¶¶ 78-96 (Dkt. 78).  Jacksons moved again for summary judgment, arguing that each of these claims fails because Jacksons made no promises to pay Plaintiff any overtime or additional insurance-related benefits; and that, without such predicate promises from Jacksons to Plaintiff, his claims against Jacksons cannot stand.  *See generally* Jacksons' Mem. ISO of MSJ (Dkt. 126-2).  That motion is decided here.

## II.  <u>LEGAL STANDARD</u>

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  One principal purpose of summary judgment "is to isolate and dispose of

factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.

The burden of establishing the absence of a genuine issue of material fact lies with the moving party, and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party.  *See id*. at 322-23; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).  A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law, and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To show that a genuine issue of material fact is not in dispute, a party may cite to particular materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact.  *See* Fed. R. Civ. P. 56(c)(1)(A) & (B); *Ransier v. United States*, 2014 WL 5305852, at *2 (D. Idaho 2014).

In response, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Celotex*, 477 U.S. at 322-23.  Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).  Similarly, conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and defeat summary judgment.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  The nonmoving party must produce some significant probative evidence tending to contradict the moving party's allegations, thereby

**MEMORANDUM DECISION AND ORDER - 4**

creating a material question of fact.  *See Anderson*, 477 U.S. at 256-57 (plaintiff must present affirmative evidence to defeat properly supported motion for summary judgment).

Rule 56(e)(3) authorizes summary judgment for the moving party "if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).  Though the Court may not weigh conflicting evidence or make credibility determinations, there must be more than a mere scintilla of contradictory evidence to survive summary judgment.  *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson*, 477 U.S. at 252; *see also Weston v. Harrigan*, 359 F.App'x 868, 870 (9th Cir. 2009) ("A court does not have to accept as true allegations that are contradicted by the record and which no reasonable jury would believe.").  "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

## III.  <u>DISCUSSION</u>

**A.**   **Plaintiff's Claims Assume an Entitlement to Certain Benefits from Jacksons**

Each of Plaintiff's three remaining claims – (1) failure to pay insurance-related wages, (2) wrongful termination based on wage concerns, and (3) retaliation based on complaints regarding overtime compensation under the FLSA – presupposes that he was not fully compensated and that it was Jacksons' obligation to pay him the additional compensation.  To be

**MEMORANDUM DECISION AND ORDER - 5**

clear, Plaintiff does not allege he was never paid; rather, he argues that he was not paid *as much* as he was entitled, contending that he was owed overtime pay, fringe benefits, differences in insurance coverage benefits, flight differential pay (higher rates for certain flights), per diems, and payment for time logged before/after shifts.  *See* Pl.'s First Am. Compl., ¶¶ 13, 20-25, 34, 38-47 (Dkt. 78).  Plaintiff alleges that Jacksons was responsible for these *additional* benefits, beyond the salary and insurance benefits that Jacksons indisputably paid/provided to Plaintiff for the entirety of his employment with Jacksons.

For example, under the Idaho Wage Claim Act ("IWCA"), a "wage claim" means "an employee's claim against an employer for compensation for the employee's own personal services, and includes wages, penalties, or damages provided by law to employees with a claim for unpaid wages."  I.C. § 45-601(6).  "Wages" are defined under the IWCA as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece or commission basis."  I.C. § 45-601(7).  While employers are required to pay wages monthly, the employer and employee have a great deal of freedom to determine how that compensation will be paid – that is, "the [IWCA] does not place any limitations on the ability of the employer and employee to contract for the terms of the employee's compensation."  *Bakker v. Thunder-Spring-Wareham, LLC*, 108 P.3d 332, 337 (Idaho 2005).  To this end, Plaintiff claims that Jacksons "promised" certain insurance-related benefits, alleging as the basis for his first claim (failure to pay insurance-related wages) that "Defendants willfully violated [the IWCA] by failing to pay [Plaintiff's] *promised* payments related to his insurance benefits."  Pl.'s First Am. Compl, ¶ 79 (Dkt. 78) (emphasis added).

Relatedly, the right to discharge an at-will employee (like Plaintiff) is limited by considerations of public policy, such as when the motivation for the firing contravenes public policy.  *See Van v. Portneuf Med. Ctr.*, 212 P.3d 982, 991 (Idaho 2009).  One such exception

protects employees who refuse to commit unlawful acts, who perform important public obligations, or, relevant here, who exercise certain legal rights and privileges.  *See id*.  It follows that an employer may not discharge an at-will employee without cause when the discharge would violate public policy.  *See id*.  Plaintiff claims that his "termination . . . amounts to wrongful discharge as it offends public policies enacted to ensure the economic security of employees," alleging in support of his second claim (wrongful termination) that Jacksons terminated his employment "immediately after he reported shortcomings in pay and then blacklisted [him] from obtaining new employment in the Pacific Northwest."  Pl.'s First Am. Compl, ¶¶ 85-88 (Dkt. 78).  Plaintiff relies upon Idaho Code § 45-613, which states in relevant part:

> No employer shall discharge or in any other manner retaliate against any employee *because that employee has made a complaint to the employer, or to the department, or filed suit alleging that the employee has not been paid in accordance with the [IWCA]*, or because the employee has testified or may be about to testify in an investigation or hearing undertaken by the department.  The provisions of this section shall not be construed to otherwise restrict the discipline or termination of an employee.

*See id*. at ¶ 84 (quoting I.C. § 45-613 (emphasis added)).

Finally, and in the same vein, the FLSA proscribes firing, or in any other manner discriminating against, an employee for complaining about an employer's failure to pay required overtime.  *See* 29 U.S.C. §§ 207(a)(1), 215(a)(3).  Plaintiff claims he "had an objectively reasonable belief"[3] that Jacksons was required to pay his overtime under the FLSA, alleging as

---

[3] This select turn-of-phrase is likely drawn from the Court's handling of Plaintiff's earlier Motion to Amend within its March 12, 2018 Memorandum Decision and Order.  *See supra*. There, the Court re-phrased Plaintiff's response to Jacksons' then-raised futility argument as follows:

> Plaintiff acknowledges that he may not be entitled to FLSA-mandated overtime [ ], but nonetheless argues that he remains protected by FLSA's anti-retaliation provision.  According to Plaintiff, so long as his wage complaint is in good faith *and objectively reasonable* (even if mistaken and [Jacksons'] conduct is actually lawful), his FLSA retaliation claim is properly asserted.

**MEMORANDUM DECISION AND ORDER - 7**

the basis for his third claim (retaliation based on complaints for overtime compensation under the FLSA) that Jacksons fired him on July 10, 2014 "because he complained, just the day before, that they had not paid him and the other pilots overtime."  Pl.'s First Am. Compl. ¶¶ 92, 94 (Dkt. 78).

In sum, the viability of Plaintiff's claims against Jacksons – and, thus, this action in its entirety – turns on whether Jacksons was required to pay Plaintiff those additional employment benefits he claims he should have received.  For the reasons that follow, the Court concludes that, even if Plaintiff was entitled to compensation/benefits above and beyond what Jacksons actually paid to him, any such additional compensation/benefits were not Jacksons' responsibility.

## B.    Jacksons Was Not Obligated to Pay Plaintiff Certain Additional Benefits

Plaintiff's theory against Jacksons runs a particular path and proceeds as follows: (1) owing to promises made at the time he was hired, Jacksons owes/owed him more than he was actually paid (including insurance-related wages and overtime); and (2) Jacksons improperly fired him and/or retaliated against him in violation of public policy and the FLSA after he complained that he had not been fully compensated as originally promised.  The record, however, does not neatly track such a path; rather, it indicates that even though certain promises may have been made to Plaintiff when he was first hired, any such promises did not originate with Jacksons and that, actually, Jacksons paid Plaintiff all that Jacksons was required to pay.

---

3/12/18 MDO, p. 21 (Dkt. 77) (internal citations omitted, emphasis added).  At that time, the Court declined to find as a matter of law that Plaintiff is foreclosed from making an FLSA retaliation claim because of Jacksons' status as an exempt employer, though acknowledging the inherent logic to that reasoning.  *Id.* at pp. 21-22.  Instead, the Court simply permitted the amendment, leaving for another day the question of whether an FLSA retaliation claim could prevail against an exempt employer.  *See id.* at p. 22 (. . . neither party has put before the Court any authority (binding or otherwise) directly apropos of what is a nuanced, complicated, and potentially lynchpin issue.").

**MEMORANDUM DECISION AND ORDER - 8**

Plaintiff's pleadings (both his original Complaint and First Amended Complaint) either collectively group Jacksons with LFN (denoting them as "Defendants"), or clearly differentiate the two when alleging how certain promises were made to him when being recruited in late 2013.[4]  Significantly, however, Plaintiff's own pleadings do not specifically allege that *Jacksons* made any of the promises Plaintiff relies upon to support the three claims he has asserted against *Jacksons*.  Instead, the pleadings point to *LFN* as the source of promises.  For instance, within his First Amended Complaint, Plaintiff alleges:

- "LFN recruited Mr. Kreb and had him placed in Lewiston, Idaho as his principal base of operations."  Pl.'s First Am. Compl., ¶ 7 (Dkt. 78).

- "LFN contracted with [Jacksons] to co-employ Mr. Kreb to perform emergency medical service ("EMS") transport under the LFN banner."  *Id*. at ¶ 10.

- "Mr. Kreb first submitted his application for hire through the 'jobs@lifeflight.org' [(LFN)] email address on November 3, 2013."  Id. at ¶ 15.

- "On November 19, 2013, Mr. Kreb was interviewed on the telephone by Ryan Swakon, LFN Director of Operations, BJ Miles, LFN Director of Safety and Risk Management, and Ron Fergie, LFN Chief Pilot."  *Id*. at ¶ 16.

- "LFN then arranged for Mr. Kreb to attend an in-person interview at the LFN headquarters in Aurora, Oregon.  This was later revised to an in-person interview in Boise, Idaho at the Jackson Jet Center, LLC [("JJC")] headquarters."  *Id*. at ¶ 17.

- "Ryan Swakon, Ron Fergie [(both for LFN)] and Steve Bower for JJC informed Mr. Kreb that LFN was working towards obtaining an FAA FAR Part 135 certificate within a 90 day timeframe."  *Id*. at ¶ 18.

- "These men told Mr. Kreb that, in the meantime, JJC would be Mr. Kreb's employer in name; he would nevertheless fly LFN owned planes, wear an LFN uniform, follow LFN protocol and would be expected to follow LFN flight directives, including safety protocols."  *Id*. at ¶ 19.

- "*Additionally, Mr. Swakon, Mr. Fergie and Nicole Barnard-Croft all assured Mr. Kreb that pilots who fly for LFN receive overtime compensation and all LFN fringe*

---

[4]  Again, Plaintiff already dismissed his claims against LFN, and the Court dismissed LFN from the lawsuit in 2017; the details leading up to LFN's dismissal (or any related terms) are not in the record.  *See supra*.

**MEMORANDUM DECISION AND ORDER - 9**

*benefits regardless of who was his employer in name.*"  *Id.* at ¶ 20 (emphasis added).

- "*Though Mr. Kreb was going to be paid through JJC's payroll system, Mr. Swakon stated to Mr. Kreb in his Boise interview that LFN would cut a check for any benefits coverage differences, and differences in deductibles not covered by the JJC insurer.*  Mr. Swakon further stated that all overtime, PTO and sick days would be calculated and paid through JJC payroll." *Id.* at ¶ 21 (emphasis added).[5]

- "*LFN's company handbooks provide for overtime pay of pilots and for flight differentials where flights that occurred later in the scheduled shift were paid at a higher premium.*"  *Id.* at ¶ 23 (emphasis added).

- "*LFN represented that per diems would be provided to pilots for company required training, travel to training centers, and other overnight stays.*"  *Id.* at ¶ 24 (emphasis added).

- "*LFN assured Mr. Kreb and other Lewiston pilots numerous times that they would soon be paid by LFN payroll and would be eligible to receive all of the same benefits, compensation and bonus structures as other LFN employees.*" *Id.* at ¶ 25 (emphasis added).

- "*LFN's intentions regarding the compensation of pilots like Mr. Kreb were memorialized in many communications from LFN to Mr. Kreb and JJC management.*" *Id.* at ¶ 26.

- "*LFN agreed to pay Mr. Kreb's $29.10 hourly wage with an annual $1000.00 ATP stipend.*  This was confirmed by an offer of employment emailed from Mr. Steve Bower [(for JJC)] to Mr. Kreb on Friday, December 13, 2013." *Id.* at ¶ 27 (emphasis added).

- "After nearly a one month recruitment process, LFN hired Mr. Kreb to fly out of the Lewiston, Idaho base.  He would commute from his home in Friday Harbor each week to start a seven-day schedule for LFN." *Id.* at ¶ 31.

---

[5]  Plaintiff argues that, before LFN was dismissed from the action, it admitted that Mr. Swakon [of LFN] told Plaintiff that all overtime, PTO and sick days would be calculated and paid through JJC payroll. *See* Ex. 2 at ¶ 4.12 to Pl.'s Errata (Dkt. 176-2) (attaching LFN's Answer and Affirmative Defenses to Plaintiff's original Complaint).  However, this is an allegation of a statement made by an LFN representative, not by anyone from Jacksons. Moreover, LFN *expressly denied* Plaintiff's additional allegation that:  "Mr. Bower, as JJC's representative, agreed to this arrangement at the time of the interview." *See id.*; *compare with* Pl.'s Compl., ¶ 4.12 (Dkt. 1-1) *and* Pl.'s First Am. Compl., ¶ 22 (Dkt. 78).  Hence, although Plaintiff alleges that LFN may have once suggested that overtime would be paid through Jacksons, Jacksons itself never stated that to Plaintiff or anyone else. *But see infra* (discussing 12/13/13 and 1/16/14 emails from Steve Bower to Plaintiff and other JJC pilots).

**MEMORANDUM DECISION AND ORDER - 10**

- "*Mr. Kreb did not receive the per diem pay promised by LFN during his training period.*" *Id*. at ¶ 34 (emphasis added).

- "JJC only paid Mr. Kreb 'straight time' pay and limited their payments to 80 hours per two-week pay period, regardless of the hours he worked." *Id*. at ¶ 38.

- "*This was not what LFN promised Mr. Kreb at the time he was hired,* nor was it what he understood federal overtime law required." *Id*. at ¶ 39 (emphasis added).

- "After Mr. Kreb protested this change in pay, Steve Bower, Director of Operations for JJC, wrote the three Lewiston pilots, Mr. Kreb, Matt Stewart, and Craig Young, and stated that JJC hired the three pilots as 'salaried professionals.'" *Id*. at ¶ 40.

- "Mr. Bower explained that JJC had decided to pay the pilots by using the LFN hourly rate and then multiplying it by an approximate 2184 hours 'normally worked in a year' by the pilots, converting their pay to a 'salary' rate. Their paycheck reflected 80 hours, though he acknowledged that this was not the hours that they actually worked. In fact, the pilots were scheduled to be working at least 84 hours per work week." *Id*. at ¶ 41.

- "This pay arrangement was not communicated to Mr. Kreb at the time of hire." *Id*. at ¶ 42.

- "Mr. Bower added that when LFN soon became their employer, that they would have a method of paying for overtime compensation. Mr. Kreb believed that he was entitled to overtime compensation not only due to his original agreement when he was hired but also under federal overtime law." *Id*. at ¶ 43.

- "Mr. Kreb continued to raise his objections regarding wages with Defendants." *Id*. at ¶ 44.

- "Beginning in March 2014, Mr. Kreb began working additional days, *but was not paid double time pay as he had been promised by LFN.*" *Id*. at ¶ 45 (emphasis added).

- "Defendants did not compensate Mr. Kreb for this [(shift change and safety briefing and other pre-flight duties)] 'off the clock' time." *Id*. at ¶ 47.

- "As a result of Defendants' failure to correct these pay issues, Mr. Kreb was not paid wages as required by law, including hourly pay and overtime pay requirements." *Id*. at ¶ 48.

- "At no time did Defendants assert or make known to Mr. Kreb that they allegedly thought he was exempt from overtime pay." *Id*. at ¶ 49; *but see id*. at ¶¶ 40-41.

**MEMORANDUM DECISION AND ORDER - 11**

- "When Mr. Kreb complained to JJC's agent, Wayne Werner, regarding pay, Mr. Werner stated, '*Thanks for reaching out to LFN as this is the proper channel to go through*." *Id*. at ¶ 50 (emphasis added).

- "*Mr. Kreb also protested to LFN that is promises to pay him more were not honored during those first six months of employment.*" *Id*. at ¶ 51 (emphasis added).

- "Mr. Fergie, LFN Chief Pilot, acknowledged the issue on June 19, 2014, telling Mr. Kreb, 'Soon we will be under one umbrella' and they could address the problems then." *Id*. at ¶ 52.

- "After the pilots protested the discrepancies between the promised compensation and the compensation actually received numerous times, *Ryan Swakon for LFN finally called a conference call between the Lewiston pilots and himself. Id*. at ¶ 54 (emphasis added).

- "*In that conference call on July 8, 2014 Mr. Swakon admitted that there were issues with pay that needed to be corrected*." *Id*. at ¶ 55 (emphasis added).

- "*Mr. Swakon assured the pilots that going forward, their overtime pay and flight differential promises would be honored*." *Id*. at ¶ 56 (emphasis added).

- "Steve Bower sent an email *confirming LFN's commitment to honor their promises regarding pay* the following day to all of the pilots in Lewiston who flew for LFN." *Id*. at ¶ 57 (emphasis added).

The record itself mirrors the focus of Plaintiff's pleadings, *i.e.*, that, if anything, it was LFN – not Jacksons – that made promises to Plaintiff (and that Plaintiff understood as much). The record also provides factual context to Plaintiff's claim for additional benefits, context that illustrates real-time facts regarding what was said, and by who/whom.  For example, on December 13, 2013, Jacksons' Steve Bower relayed to Plaintiff that he "will receive a $1000 annual ATP stipend, full-time [JJC] pilot benefits, *and additional compensation for hours worked beyond your scheduled shifts*." Ex. 6 to Kreb Decl. (Dkt. 141-6) (emphasis added). Importantly, Mr. Bower did not say that *Jacksons* would be responsible for these benefits (other than the full-time JJC pilot benefits).  *See id*.  The distinction was further illustrated a month later when the first pay checks went out and LFN pilots were told that (as to their relationship with Jacksons) each was "a salaried exempt employee, which means that you are paid the same

amount every 2 weeks regardless of your schedule or the amount of hours you work." Ex. 5 to

Kreb Decl. (Dkt. 141-5). An email to the pilots from Mr. Bower two days later, on January 16,

2014, repeated the information, stating in relevant part:

> *I hired you as salaried professional pilots. That is an exempt employee status, meaning that you are not entitled to overtime pay, nor are you docked when your schedule involves less than 40 hours per week. For example, you are receiving your normal salary now while waiting for us to be able to start your local training.*
>
> I converted the hourly rate [LFN] told me to an annual salary by multiplying it by the 2184 hours you will normally work in a year. Our payroll department converted that annual salary to a bi-weekly salary by dividing it into 26 pay periods. *The pay stubs will show 80 hours per pay period even though we understand that your schedule will always differ from that.*
>
> Regarding the ATP stipend, I misunderstood and consequently mis-communicated what [JJC] can do. We require all our pilots to have an ATP as a condition of employment, so we don't pay a bonus for it. *[LFN], when they get their certificate and become your employer, may be able to offer that bonus as they described in their hiring request details.*
>
> Regarding extra pay for shifts longer than 12 hours, you would have to become non-exempt employees (hourly) to earn what amounts to overtime. We aren't set up that way, but again, [LFN] apparently will have a method to honor that feature when they become your employer.
>
> For now, I hope you enjoy your paid time at home waiting for us to get ready to begin your training here. It currently appears that we will be ready on or about Monday, January 27. . . .

Ex. F to Gunn Decl. (Dkt. 126-5) (emphasis added).[6] The correspondence that followed is

consistent on the subject of, and leaves no room for ambiguity, the different obligations as

between Jacksons and LFN, namely:

---

[6] Two other LFN pilots hired by Jacksons, Craig Young and Aaron Roark, reiterated that "it was made clear to [themselves] and the other pilots that we were salaried employees and would not receive overtime compensation from [JJC]" and that, at the time of hire, "it was also made clear . . . that we would receive [JJC] benefits, and that any differential in the benefits between [JJC] and [LFN] would be the sole responsibility of [LFN]." Young Decl., ¶¶ 3-4 (Dkt. 126-3); Roark Decl., ¶¶ 3-4 (Dkt. 126-4). Their employment with Jacksons terminated on August 11, 2014 and neither was hired by LFN. *See* Young Decl., ¶¶ 11-12 (Dkt. 126-3); Roark Decl., ¶¶ 5-6 (Dkt. 126-4).

**MEMORANDUM DECISION AND ORDER - 13**

- In a June 7, 2014 email to Aaron Roark and Craig Young, Plaintiff responded to a schedule change proposal involving the three JJC/LFN pilots, stating: "I think this is what you were after.  I do not believe extra day pay for my two 8-day weeks you propose for me [sic] *and I cannot agree to that particularly until our overtime/holiday pay issue with LFN is remedied*."  Ex. J to Gunn Decl. (Dkt. 126-5) (emphasis added); *see also id*. (Plaintiff's subsequent email four minutes later stating:  "My extra day pay for 2 8-day weeks will not likely be approved.").

- In a June 12, 2014 email to JJC/LFN pilots, JJC's Ryan Pike states in relevant part: "Hey guys, BJ Miles from [LFN] is coming out on 6/24 to do your AMRM training.  All of you are required to be in attendance.  Aaron and Craig, I'll need you [to] stay an extra day for this, *and we'll bill [LFN] for the overtime for you*."  Ex. 1 to Kreb Decl. (Dkt. 141-1) (emphasis added).

- In a June 19, 2014 email string between Plaintiff and LFN's Ron Fergie, Plaintiff attempted to "clear[ ] up the discrepancy of pay/benefits between the LWS [(Lewiston-Nez Perce County Regional Airport)] FW [(fixed-wing)] Pilots and those hired from Aero Air and other places in recent months," complaining that:

  > BJ Miles is conducting Mandatory Attendance Safety Training next week in Lewiston.  Dan [Jackson] will be compensated with substantial overtime consideration and per diem *while LWS Pilots will only receive a flat daily rate for the same attendance*.  I heard a rumor our 4th was hired and will likely be receiving that same compensation subsidy as the other newer hires *while we continue to be deferred/limited to only that salary schedule from Jacksons*?

  > *I am hoping you have encouraging news for LWS Pilots' assimilation of overtime/pay as the newer hires'* or positive feedback from your meeting last week with Senior Management you hoped to raise this issue?

  Ex. K to Gunn Decl. (Dkt. 126-5) (emphasis added).

- On June 19, 2014, Ron Fergie [LFN] responded to Plaintiff about his understanding of LFN's pay protocols, saying he had talked to "[LFN's] Ryan [Swakon] about this issue" and that:

  > [H]is explanation to me was that the daily rate is based on time and a half and should work out to be about the same.  He also said you had an opportunity to address this with him but you said you didn't have any problems.  I have cc'ed Ryan on this email as he is the one who would be most able to explain and or help with the pay structure.  I hope this will help.

  *Id*.

- On June 19, 2014, Plaintiff then responded to Ron Fergie, stating in relevant part:

**MEMORANDUM DECISION AND ORDER - 14**

I have been on a merry-go-round of deferrals to find relief on this issue for far too long, but to no avail.  I apologize I only felt it proper to begin with you in the anticipated chain of command.

I haven't spoke to Ryan since he called after I returned to cover Matt Stewart's shift when he was let go in March.  I heard Ryan was in Boise when I delivered 890WA for a 100-hr but was inclined time constraints of his scheduled departure [sic] did not leave adequate time to address the aircraft squawk list with Brent Demer and also address the pay and benefits issue I was not prepared to raise in such little amount of time Wayne Warner made no promises would actually be available for me [sic].

. . . .

Dan Jackson has stated he and all of the newer hires are receiving the same [JJC] daily pay rates as Lewiston hires, *but then making entry in the LFN ADP payroll site for additional overtime for additional days of work, travel and all duty days exceeding 7 normal 12-hr shift as well as additional compensation for holiday pay when worked and per diem when away from their bases.  Dan has also stated he and the other pilots are included on the LFN insurance programs and not limited [to] Jacksons coverages as the Lewiston pilots are at much higher premiums, deductibles and at lesser coverages.*

*All of these measures were promised to me when I was interviewed and hired in December where no deferral or differentiation was inferred to commensurate with LFN receiving a Certificate and Ops Specs except for benefits which were stated would be supplemented where deficient on Jackson's coverage until such time as open enrollment with LFN could be made available [sic].*

This could be construed as a reduction in promised compensation in addition to salary negotiations I chose to defer as a result of additional promises of leadership, advancement and or lateral assignment to new base location opportunities that we previously discussed and were provided a loosely diplomatic and quaint deferral and discount of my potential grievance having not even been notified such actions were ensuing, much less tender my desire for consideration or candidacy [sic].

We have broken our backs and sought to give 150% to the mission and vision of LFN with Fixed Wing ops cutting a lot of roads and pouring a lot of foundation that did not previously exist, without a safety net and yet, with considerable positive results because LFN

**MEMORANDUM DECISION AND ORDER - 15**

has been raved as the best to care for its staff and the best and highly sought places for its staff to call home. *LFN's treatment of the same group of workers differently in compensation and access to benefits because their roots are alternatively traced and as a direct result of a backroom deal out of necessity or convenience has to be recognized as inconsistent if not counterproductive and even detrimental to such accolades?*

Please forward as necessary.  It is disappointing to go months without any advocate for relief or for anyone to accept ownership, obligation and/or pride and stewardship of us in LWS FW and all the hard work and loyalty we have dispensed, only to take a back seat to a pompous Aero Air Contingent that was interested in coming to LFN only after their cushy entrenchment in Hillsboro was in jeopardy by maturing of the LFN FW Commander Contract.

I apologize for any grief caused you.  Surely you can imagine my exhaustive pursuit to date and hope for any miniscule grain of remedy but deferred at every turn while the status quo prevails, negatively affecting my income, expenditures for a lackluster health plan and a ridiculous commute every week [sic].

*Id*. (emphasis added).

- Then, in a June 26, 2014 email to LFN's Ryan Swakon and Ron Fergie, Plaintiff stated in relevant part:

    In attending BJ's AMRM briefing Tuesday, *I was elated to find affirmation, recollection and support implicated in my pursuits since April to remedy exclusion of LWS FW Pilots from conciliatory provisions to other pilots more recently hired. . . . .*

    I am going to break the biggest rule of negotiation by disclosing upfront:  I will not be escalating my assertions beyond this conclusive criticism to further confront or create a conflict because of these inducements.  Even if justified and appreciable on very significant aspects of our recruitment or future roles with LFN, I do not feel anyone will properly benefit from drawing any lines in the sand on these issues.

    Therefore, I will simply speak my peace in three simple and concise points, withhold demand or place any expectation upon LFN for remedy.  *It is at LFN's pleasure, whether to operate within mission specifications and parameters they set and then disclosed when I joined the team.*  My aim is only to draw attention and/or distinction; this aircraft's attitude and situation are not in alignment or is deviating from a course and objectives that we agreed upon at my

**MEMORANDUM DECISION AND ORDER - 16**

hire and for our mutual enrichment.  The value of my input as a crew of this mission of LFN can only be determined by leadership at LFN.

Fear of reprisal by my fellow crew mates to speak up or their refusal to tender a view when solicited "do you have any problems" should not be an adequate gauge of their health, morale or support *for reported flaws in any LFN operation*.

*1. Compensation*

I was tendered an offer for an hourly wage to accept the LWS FW Position.  *Jackson's payroll system/structure lacked an ability for payroll adjustments to compensate our overtime and holiday duties and was only to be a temporary solution to surrogate our compensation.   Dated inquiries upon learning LWS Pilots' exclusion from adjustments provided other pilots hired well after our induction [sic].  Jacksons has stated all pilots on LFN dedicated operations are being compensated equally within their payroll. Non-LWS Pilots are reported as receiving hourly, overtime, holiday and per diem supplements by LFN.*

*2. Insurance Benefits*

*I was hired with the stated expectation to be placed upon an LFN medical, dental, vision and life benefit coverage option(s) at the earliest available opportunity and that any shortcomings from limitations of coverage under any enrolled Jackson's coverage would be supplemented by LFN according to their attractive coverage option(s).  I have been fortunate to not require such intervention by LFN and have yet been offered enrollment under LFN to enjoy those benefits with that same exclusivity as cited above regarding compensation.*

3.  LFN Seniority, Growth and Future Base Assignments

. . . .

In conclusion, I am only asserting, boldly and I hope, concisely herein, a level of criticism I wish to escalate no further in communicating these deficiencies while omitting a host of secondary shortcomings I hope may be resolved with complete LFN assimilation I understand is scheduled.

I entertained complains from my LWS teammates prior to raising the original protest in April and thoroughly discussed potential effectiveness from our unity.  Aaron [Roark] and Craig [Young] reconsidered their positions and were adamant, declining any

**MEMORANDUM DECISION AND ORDER - 17**

support and asked to be excluded in any communication I made to LFN.  Any backlash or retribution of this conclusive and intended constructive criticism should be reserved for me alone as Craig and Aaron have asked I not speak on their behalf.  *Other than confirming and supporting context of LFN commitments during our recruitment*.  Any indictment of their corporate support is purely unintentional.

Ex. G to Gunn Decl. (Dkt. 126-5) (emphasis added).

- On July 9, 2014, JJC's Steve Bower emailed Plaintiff, Craig Young, and Aaron Roark, stating in relevant part:  "*[LFN's] Ryan Swakon told me this morning that he contacted you all last night and that LFN is now providing you with their benefits and overtime compensation.  I think that's wonderful.  He also said you are interested in helping fill the schedule for the missing fourth pilot now that you will earn about double what Jacksons paid for working days off. . . . .*"  Ex. H to Gunn Decl. (Dkt. 126-5) (emphasis added).[7]

Over and over again, the record highlights that, whatever benefits Plaintiff claims to have been owed (but never received), such benefits were not promised to him by Jacksons when he was recruited by LFN and later hired by Jacksons because of that recruitment, to then fly exclusively for LFN.  Likewise, it is inescapable that Plaintiff understood that Jacksons was not

---

[7]  Plaintiff argues that when deposed, LFN's Ryan Swakon disagreed with the representations made in Steve Bower's July 9, 2014 email (though Plaintiff, as part of the July 8, 2014 meeting with Mr. Swakon, nonetheless alleged them to be true (*see* Pl.'s Am. Compl., ¶¶ 55-57 (Dkt. 78))), claiming that he only told Mr. Bower that LFN was "moving forward with the process to bring [JJC/LFN pilots] on board."  *See* Ex. 1 at 111:20-112:12 to Pl.'s Errata (Dkt. 176-1); *see also id*. at 114:11-14.  According to Mr. Swakon, as of July 8-9, 2014, LFN was not providing the JJC/LFN pilots with LFN benefits and overtime compensation because "[t]here's no way [LFN] can provide them with compensation and pay if they're not my employees."  *Id*. at 112:17-113:11.  Regardless, even if LFN never actually incorporated the JJC/LFN pilots into LFN's benefits and overtime compensation structure, it is undisputed that only LFN could approve increases in Plaintiff's (or other JJC/LFN pilots') benefits and overtime compensation.  *See id*. at 114:15-21 (Mr. Swakon testifying that JJC/LFN pilots based in Lewiston flying on behalf of LFN did not get any increase in their benefits and overtime compensation between July and August 2014 "[b]ecause I did not approve it."); *see also id*. at 115:3-7 (Mr. Swakon characterizing his conversation with JJC pilots as follows:  "[JJC] has their pay practices, and LFN has our pay practices.  *And I did tell them on the phone that when they became an LFN employee, they would fall under our pay practice.*") (emphasis added).  This testimony aligns with Mr. Bower's January 16, 2014 email that the JJC/LFN pilots are not entitled to overtime pay.  *See supra*.  It was, after all, *LFN's* pay practices, not Jacksons' pay practices, that were the source of Plaintiff's claims, as he repeatedly described in his communications.

**MEMORANDUM DECISION AND ORDER - 18**

responsible for these additional benefits, as his own communications consistently directed his inquiries and complaints about the issue to LFN (not Jacksons) because only LFN (not Jacksons) could account for such benefits. *See supra*. In this setting, Plaintiff's claims against Jacksons cannot stand.

In other words, where Plaintiff's claim for failure to pay insurance-related wages (his first claim) presumes a promise from Jacksons to pay those wages, the absence of such a promise necessarily defeats the claim. Simply put, the record does not reflect that Jacksons was obligated to pay Plaintiff the insurance-related wages he now seeks. And, without such an obligation, there can be no wrongful termination in violation of public policy (his second claim) when the claim is anchored on that (or some other) imagined obligation in the first instance. This also upends Plaintiff's retaliation claim under the FLSA (his third claim). Even if Plaintiff, as an exempt employee, had a good faith belief[8] that Jacksons was still responsible for his overtime pay, the record proves there was no such responsibility, to wit: Jacksons had not paid any JJC pilots overtime. *See, e.g.*, *Keith v. Univ. of Miami*, 437 F. Supp. 3d 1167, 1171-73 (S.D. Fla. 2020) (in dismissing complaint, rejecting employee's good faith belief that she was entitled to more compensation under FLSA as not "objectively reasonable belief," stating: "Where, as here, Plaintiff was explicitly exempt and therefore not covered by the FLSA, the court concludes no reasonable employer, given the context and content, could have perceived her complaint as a

---

[8] On this point, Plaintiff seeks to emphasize Steve Bower's December 13, 2013 email. *See supra*. But his argument that it supports Plaintiff's alleged good faith belief about Jacksons paying overtime is undermined by the subsequent January 14 & 16, 2014 correspondence from Jacksons (six months before Plaintiff was terminated), coupled with Jacksons never paying overtime, Plaintiff's own correspondence *to LFN* thereafter about overtime, Plaintiff's allegations in his First Amended Complaint, the Declarations of Messrs. Young and Roark, and the deposition testimony of LFN's Ryan Swakon. *See id*; *see also, e.g.*, *Range Road Music Inc. v. East Coast Foods, Inc.*, 2010 WL 11527426, at *4 (C.D. Cal. 2010) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

**MEMORANDUM DECISION AND ORDER - 19**

genuine assertion of rights under the FLSA. . . .   Because Plaintiff is explicitly exempt and therefore not covered by the FLSA, Plaintiff's cause of action under the FLSA is futile.").

Plaintiff understandably seeks to emphasize some aspects of this record in isolation and attempts to construe from such isolated pieces of the record inferences in his favor to argue a genuine dispute of material fact to avoid summary judgment.  But this is a record that must be considered in toto, and even the inferences that Plaintiff would draw upon fail the test of being *reasonable* inferences (that would then create a *genuine* issue of material fact) when measured against the entirety of the record.  *See Anderson*, 477 U.S. at 252; *Scott*, 550 U.S. at 380; *Weston*, 359 F.App'x at 870.

Even when construing all reasonable inferences in Plaintiff's favor, no reasonable juror could conclude that Jacksons was obligated to pay Plaintiff the at-issue additional benefits.  *See id*.  Therefore, there is no genuine issue of material fact that would preclude entry of summary judgment.  Accordingly, Jacksons' Motion for Summary Judgment is granted and Plaintiff's claims against Jacksons are dismissed.[9]

## IV.  ORDER

Based on the foregoing, IT IS HEREBY ORDERED that

1.       Defendants' Motion for Summary Judgment (Dkt. 126) is GRANTED;

2.       Plaintiff's claims against Jacksons are DISMISSED; and

---

[9]  After Plaintiff's counsel withdrew on July 13, 2020, Plaintiff has represented himself and, in that capacity, has repeatedly suggested that Jacksons has not complied with its discovery obligations.  *See, e.g.*, Pl.'s Mem. ISO Mot. for Recusal or Disqual. of Judge, p. 6 (Dkt. 136-2).  The Court notes that the only Motion to Compel, filed on May 21, 2019, was seemingly resolved as of June 28, 2019 (pursuant to a stipulation whereby Jacksons agreed to produce the documents ordered by the Court on or before that date).  *See* Mtn. to Compel (Dkt. 92); 6/12/19 Order (Dkt. 98); Stip. for Ext. of Time (Dkt. 101).  Thereafter, in the parties' February 14, 2020 and May 4, 2020 *Joint* Status Reports (Dkts. 112 & 113) (while Plaintiff was still represented by counsel), there is no mention of any problematic outstanding discovery issues.  Nor has another Motion to Compel ever been filed before the expiration of the discovery deadline in this case.

**MEMORANDUM DECISION AND ORDER - 20**

3.      The seven-day jury trial set to begin April 13, 2021 trial is VACATED.



DATED: March 5, 2021

Ronald E. Bush
Chief U.S. Magistrate Judge